IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SLINGSHOT PRINTING LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>HP INC.,<br><br>               Defendant. | C.A. No.  6:19-cv-00362<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Slingshot Printing LLC ("Slingshot" or "Plaintiff"), files this complaint for patent infringement against Defendant HP Inc. ("HP" or "Defendant") under 35 U.S.C. § 271, as a result of HP's unauthorized use of Slingshot's patents, and alleges as follows:

## THE PARTIES

1.      Slingshot is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 8455 Colesville Road, Suite 830, Silver Spring, MD 20910.

2.      On information and belief, HP is a Delaware corporation with a principal place of business at 1501 Page Mill Road, Palo Alto, CA 94304.

3.      On information and belief, HP formally registered to do business in the state of Texas under Texas SOS file Number 0012093906 in May 1998, and, since at least

23152307

as early as 2016, HP has had an established place of business in this judicial district with a physical office at 3800 Quick Hill Rd #100, Austin, TX 78728.

## JURISDICTION AND VENUE

4.      This is a civil action for infringement of United States Patent Nos.: 6,243,115; 6,394,593; 6,817,707; 7,258,434; and 7,938,523 (collectively, the "patents-in-suit" or "asserted patents"). True and correct copies of the patents are attached as Exhibits 1-5, respectively.

5.      This action arises under the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, generally, and 35 U.S.C. §§ 271(a), specifically.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

7.      HP is subject to this Court's specific and general personal jurisdiction, in accordance with due process and/or the Texas Long Arm Statute because, in part, HP "[r]ecruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state." *See* Tex. Civ. Prac. & Rem. Code § 17.042.

8.      Additionally, this Court has specific personal jurisdiction over HP because it committed and continues to commit acts of infringement in this judicial district in violation of 35 U.S.C. § 271(a). In particular, HP has made, used, offered to sell, and sold products and systems in this judicial district, including infringing thermal inkjet printers and thermal inkjet print cartridges.

9.      In addition, and on information and belief, HP is subject to the Court's general jurisdiction because it regularly conducts and solicits business, or otherwise

engages in other persistent courses of conduct in this district, and/or derives substantial revenue from the sale and distribution of goods and services provided to individuals and businesses in this district.

10.     In sum, this Court has specific and general personal jurisdiction over HP because, *inter alia*, HP, on information and belief: (1) has substantial, continuous, and systematic contacts with this State and this judicial district; (2) owns, manages, and operates facilities in this State and this judicial district; (3) enjoys substantial income from sales in this State and this judicial district; (4) employs Texas residents in this State and this judicial district, and (5) markets products in this State and judicial district.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400, at least because HP, either directly or through its agents, has committed acts of infringement in this district, and has a regular and established place of business in this district.

12.     On information and belief, HP maintains a significant physical presence in this district that is an established place of business of Defendant. Specifically, HP has a large corporate office at 3800 Quick Hill Rd #100, Austin, TX 78728 ("Austin Office"), which is within this judicial district. Affixed to the exterior of the Austin Office is large and clear signage that reads "HP" as seen in the image below:

23152307



Source: Google Streetview of 3800 Quick Hill Road (attached as Exhibit 6)
(https://www.google.com/maps/@30.4700385,-97.6860037,3a,75y,339.27h,89.01
t/data= !3m7!1e1!3m5!1s1Y6-J_EubV2V98_XmOH_NA!2e0!6s%2F%2Fgeo1.ggpht.com
%2Fcbk_%3Fpanoid%3D1Y6-
J_EubV2V98_XmOH_NA%26output%3Dthumbnail%26cb_clien
t%3Dmaps_sv.tactile.gps%26thumb%3D2%26w%3D203%26h%3D100%26yaw%3D137.1
953%26pitch%3D0%26thumbfov%3D100!7i16384!8i8192).

13.    On information and belief, HP uses the Austin Office as a regular and
established place of business because this location is where numerous important
employees work, including, but not limited to a Director of IT, a Director of
Governmental Affairs, software and hardware engineers, and other engineers.

14.    Additionally, HP's website lists fifty-one H-1B labor condition
applications for persons employed in Austin Texas. *See* Exhibit 7
(http://www.hp.com/hpinfo/). Thus, the workers in Austin are highly specialized and
important to the regular operation of HP because workers holding an H-1B visa are
employed in a specialty occupation that requires "theoretical and practical application

4

of a body of highly specialized knowledge . . . and attainment of a bachelor's or higher

degree in the specific specialty. . . ." *See generally* 8 U.S.C. § 1184.

15.     Moreover, HP lists several positions on its website for careers in Austin,

Texas, including the exemplary one  seen in the screenshot below:



See Exhibit 8 ([https://h30631.www3.hp.com/job/bengaluru/cyber-security-](https://h30631.www3.hp.com/job/bengaluru/cyber-security-engineer/3544/8853709)
[engineer/3544/8853709](https://h30631.www3.hp.com/job/bengaluru/cyber-security-engineer/3544/8853709)).

16.     On information and belief, HP owns real estate in the Austin, Texas region

including properties at 7501 N. Capital of Texas Highway, TX 78731; 3301 Hibbets Rd,

Austin, TX 78721; 14231 Tandem Blvd, Austin, TX 78728; and 14219 Tandem Blvd,

Austin, TX 78728.

17.     Additionally, HP operates the HP Partners First Program. *See generally,*

Exhibit 9 (HP Partners First Program Brochure). The program is a partnership

agreement between HP and retailers throughout the area that "is focused on being first

in sales, speed and solutions, offering a comprehensive framework that encompasses a

broad range of partner motions." A portion of the program is detailed in the

infographic below:

23152307



*See* Exhibit 9 at page 10.

18.     The HP Partners First Program includes three tiers of partnership: Silver, Gold, and Platinum. At every level, the partners are required to enter into a formal Partner agreement with HP, and provide Sales Certified Printing, Computing and Supplies. *Id.* at 11. Additionally, HP provides market development funds to Platinum members. *Id.* at 15.

19.     Moreover, "HP places great value in partnership with reseller partners contributing significantly towards HP's business revenue. Visibility of partner's business are critical component towards fine-tuning of collaborative sales effort." *Id* at 44.

20.     Through this HP Partners First Program, HP has hundreds of partners physically located throughout this district, including but not limited to contracted HP partners in Waco, Austin, and San Antonio. Indeed, the HP website provides consumers with the ability to search for resellers based on cities or zip codes in this

6

district. Conducting a simple search on HP's website of Waco, Austin, and San Antonio

yields the results seen in the screenshots on the following pages:



Austin, Texas



Waco, Texas

23152307



San Antonio, Texas

21.     A search of the Austin, Texas area in this portal yields at least fifty-nine

partners participating in the HP Partners First Program. Fifteen of those partners are

platinum partners. All of the platinum partners offer HP Computing, Printing, Services,

and Supplies to consumers in the Austin area.

22.     By way of example, ImageNet Consulting is listed as a Platinum Partner

selling printing services, as seen in the screenshot below:



According to ImageNet Consulting's website, the company offers several printers for sale including the HP PageWide Pro MFP P57750 and HP PageWide Managed E55650dn. Both of which are infringing inkjet printers. *See* Exhibit 10 ([http://www.imagenetconsulting.com/products/copiers-printers-scanners/workteam-printers/](http://www.imagenetconsulting.com/products/copiers-printers-scanners/workteam-printers/)).

23.     Likewise, a targeted search of the Waco, Texas area yields at least seven partners participating in the HP Partners First Program. All of those partners are Silver partners of the HP Partners First Program, and at least one of those silver members offers HP Computing, Printing, and Supplies to consumers in the Waco area. By way of further example, Texexpro LLC is listed as a Silver Partner Selling printing services, as seen in the screenshot below:



According to Texexpro LLC'S website, the company offers several printers for sale including the HP OfficeJet 4650, an infringing inkjet printer. *See* Exhibit 11 ([https://www.texexpro.com/copy-of-products](https://www.texexpro.com/copy-of-products)).

24.     Additionally, a targeted search of the San Antonio, Texas area yields at least fifty-five partners participating in the HP Partners First Program. Seventeen of

those partners are platinum partners. All of the platinum partners offer HP Computing,

Printing, Services, and Supplies to consumers in the San Antonio area.

    25.    By way of example, ARC Document Solutions LLC is listed as a Platinum

Partner Selling printing services as seen in the screenshot below:



According to Arc Document Solutions LLC's website, the company offers several

printers for sale including the HP PageWide Enterprise Color 556dn Color Printer, HP

PageWide Pro 750dw Color Printer, and the HP PageWide Pro 452dw Color Printer, all

of which are infringing inkjet printers. *See* Exhibit 12

(http://shop.arcsupplies.com/store/c-527-ink-printers.aspx).

    26.    Moreover, consumers in this district are able to purchase infringing

thermal inkjet printers and cartridges directly from HP through its online website at

https://store.hp.com/us/en. HP, directly and/or through its agents, advertises in this

district, and through its website and other websites, offers to sell, sells and/or

distributes its products in this district, and/or has induced the sale and use of its

products in this district.

27.     Accordingly, upon information and belief, HP, either directly or through its agents, distributes, markets, delivers and sells, among other products, infringing inkjet printers and inkjet cartridges within this judicial district through the HP Partners First Program; through many stores in Waco, Austin, and San Antonio and the surrounding area, such as Best Buy, S.P. Richards Co., Staples Inc., and Frys Electronics; and directly to consumers through its online store front at https://store.hp.com/us/en.

28.     On information and belief, HP, through at least its website and its partners, has substantial sales of products, including infringing inkjet printers and cartridges, in this district, and an established and substantial business presence in this district. On information and belief, HP sells its products, including infringing inkjet printers and cartridges, online through the Internet for delivery in this district, and through stores located in this district.

29.     On information and belief, HP derives substantial revenue from the sale of infringing inkjet printers and inkjet cartridges distributed to, and within this district.

30.     On information and belief, HP has previously litigated at least one patent infringement case before this court without contesting jurisdiction and venue in *Iron Oak Technologies, LLC v. HP Inc.*, Case No. 17-cv-1068, W.D. Texas.

## THE PATENTS-IN-SUIT

## Lexmark International, Inc.

31.     The patents-in-suit arise from Lexmark International, Inc.'s ("Lexmark") many years of researching, designing and developing innovative and proprietary inkjet printer and inkjet cartridge technologies.

11

32.     Lexmark was formed in 1991 when IBM divested a number of its hardware manufacturing operations, including printer and printer supply operations. Since that time, Lexmark became a leading developer, manufacturer and supplier of printing solutions including thermal inkjet printers, and their associated supplies and services. Lexmark developed and owned most of the technology for its inkjet printers and associated supplies, and that differentiated Lexmark from a number of its major competitors.

33.     Lexmark's research and development activity focused on, *inter alia*, inkjet printers and printer supplies. The process of developing new technology products is complex and requires innovative designs and engineering that anticipate customer needs and technological trends. Lexmark's research and development expenditures were $375 million in 2009, $423 million in 2008, $401 million in 2007, $371 million in 2006, $336 million in 2005, $312 million in 2004, $266 million in 2003, $247 million in 2002, $246 million in 2001, $217 million in 2000, and $184 million in 1999.

34.     Lexmark's intellectual property was one of its major assets, and ownership of its innovative and proprietary inkjet printer and inkjet cartridge technology was important to its competitive position. As of April 2013, Lexmark held approximately 1,500 inkjet patents worldwide. Lexmark was recognized as an industry leader in inkjet printer and inkjet cartridge technology.

35.     Upon information and belief, the current estimated industry-wide revenue for inkjet printer hardware and associated supplies exceeded $20 billion in the United

States alone. On information and belief, HP's annual U.S. revenue in the inkjet printer hardware and associated supplies exceeded $6 billion.

36.     In its business strategy to transition from a hardware-centric company to an end-to-end solutions company, Lexmark entered into discussions for the sales of its hardware-based inkjet-related research and development assets.

37.     Recognizing the tremendous value of Lexmark's intellectual property, in 2013, Funai Electric Co., Ltd. ("Funai") acquired Lexmark's inkjet technology and assets, including the patents-in-suit for approximately $100 million.

38.     Funai assigned to Slingshot all substantial rights, title and interest in the patents-in-suit.

### The Invention of the Patents-in-Suit

39.     Most of the early printers that could be used with personal computers were noisy impact printers, including dot-matrix and daisy-wheel printers. Both were introduced in the early 1970s. Dot-matrix printers worked by driving printhead pins into an ink-infused ribbon to get ink onto the page, and daisy-wheel printers worked by driving a wheel of pre-formed typewriter-like characters into the ribbon. But beginning in the mid-1980s, consumer inkjet and laser printers were introduced nearly simultaneously, and they eventually took over a large percentage of the printer market. Technology breakthroughs in drop-on-demand inkjet technology, however, made the devices viable for both home and small office use.

40.     Further, as a result of continuing technology advances, and starting in the mid-1990s, inkjet printers caught-up with, and surpassed all other printer types, even

13

laser printers. And because of their lower cost, ever improving resolution and ability to print in vivid color, this was when color inkjet printers and cartridges became popular in the market.

41. Inkjet printers spray liquid ink onto paper in tiny, precise drops. The ink is held in replaceable or refillable cartridges, most of which include a printhead with an array consisting of hundreds or thousands of tiny nozzles arranged close together through which the ink droplets are sprayed. Some printers have built-in printer heads that are separate from the ink cartridges. The cartridges also include microchips and other electronic components to control the ink spray, as well as ink containment systems such as foams, bladders, and springs. Inkjet printers use either thermal technology (e.g., tiny chambers where ink is heated) or piezoelectric crystals (which vibrate or change shape when charged) to propel tiny ink droplets onto a page to create the printed text or images. A printer arm moves the cartridges across the page as the images are drawn. Software algorithms interpret the computer image the user is trying to print to determine the color and position of the ink that makes it to the page.

42. Typically, the ink in an inkjet printer includes black plus three primary colors with which all the other printable colors are made through blending. The primary colors are cyan (blue), magenta (a reddish color) and yellow. Black ink is usually held in its own cartridge. For some printers, the primary colors are housed in a single cartridge, while for others, each color has its own separate cartridge.

43. As mentioned above, Lexmark entered the inkjet market after being spun-off from IBM in 1991. Highlights of its technological developments span over many

years. Lexmark announced its first inkjet printer, the IBM Color Jetprinter PS 4079, in 1992. In 1993, Lexmark introduced its first inkjet printer with an internally-developed engine (monochrome printing), the IBM ExecJet III 4076. In 1994, Lexmark announced its first internally developed inkjet color printer, the ExecJet IIc. In 1997, Lexmark announced the industry's first inkjet device capable of printing 1,200 x 1,200 dpi, the Lexmark 7000 Color Jetprinter. In 1998, Lexmark launched the industry's first 2-in-1 printer, the Lexmark 5770 Photo Jetprinter, allowing users to edit, print, and store digital photos without a PC. Lexmark continued to advance inkjet printer technology, and in 2007, announced that eight of its twelve new Lexmark inkjet printers had wireless capabilities spanning four-in-one and single-function printer categories.

44.     As the patents-in-suit demonstrate, Lexmark's research and development efforts and investments were pioneering in the industry, covering all aspects of inkjet printer technology, including printers, printheads, heater chips, substrates, inkjet containment systems, and ink drop delivery.

## United States Patent No. 6,243,115

45.     On June 5, 2001, the USPTO duly and legally issued United States Patent No. 6,243,115 ("the '115 patent") entitled "Pressurized ink supply and delivery system for an ink jet printer" to inventors Ronald W. Baker, Phillip J. Heink, Jeffrey L. Richie, and Donald Stafford. A true and correct copy of the '115 patent is attached as Exhibit 1.

46.     The '115 patent is presumed valid under 35 U.S.C. § 282.

23152307

47. Slingshot owns all substantial rights, title and interest in the '115 patent.

48. As set forth in the Abstract, the '115 patent is directed to, among other things,

> An ink supply and delivery system for a printer cartridge including a printer cartridge having an interior, at least one air inlet to the interior, and at least one ink outlet from the interior. An air pump is connected to the air inlet of the printer cartridge and creates a positive pressure in the interior of the printer cartridge. The system further includes an ink source, including ink, in the interior of the printer cartridge, the ink source in fluid communication with the ink outlet of the printer cartridge whereby the positive pressure created by the air pump in the interior of printer cartridge forces ink to flow from the ink source in the interior of the printer cartridge through the ink outlet. The ink source is preferably in a resilient container, and the system alternately includes a resilient air container either within, next to, or encapsulating the resilient container of the ink source. The printer cartridge alternately includes a vent to partially vent any accumulated pressure that has escaped from the resilient air container into the interior. There is further disclosed a method of supplying ink from a printer cartridge in a printer that prints upon a media, where the printer cartridge has an interior, at least one air inlet to the interior, and at least one ink outlet from the interior, with a positive pressure created in the interior of the printer cartridge from an air pump connected to the air inlet, and the printer cartridge further has an ink source, including ink, in the interior. The method preferably includes the steps of placing the printer cartridge into a printer, creating positive pressure in the interior of the printer cartridge through activation of the air pump, supplying ink from the ink source in the interior of the printer cartridge through the ink outlet, and printing on a media with the supplied ink.

## United States Patent No. 6,394,593

49. On May 28, 2002, the USPTO duly and legally issued United States Patent No. 6,394,593 ("the '593 patent") entitled "Vent system for ink jet pen having internal pressure regulator" to inventors Steven R. Komplin and James H. Powers. A true and correct copy of the '593 patent is attached as Exhibit 2.

50. The '593 patent is presumed valid under 35 U.S.C. § 282.

16

51.     Slingshot owns all substantial rights, title and interest in the '593 patent.

52.     As set forth in the Abstract, the '593 patent is directed to, among other

things,

> The invention relates to a vent system for an ink jet pen of the type having an
> internal pressure regulator. The vent system provides air flow communication
> between the exterior of the ink jet pen and an interior chamber associated with
> the pressure regulator while substantially inhibiting the flow of water vapor out
> of chamber to the exterior of the pen. The vent system includes an elongate flow
> path defined adjacent the exterior of the pen, the flow path having a first end in
> flow communication with the chamber and a second end in flow communication
> with the exterior of the pen.

### United States Patent No. 6,817,707

53.     On November 16, 2004, the USPTO duly and legally issued United States

Patent No. 6,817,707 ("the '707 patent") entitled "Pressure controlled ink jet printhead

assembly" to inventors John R. Fowler, Timothy L. Howard, Matthew J. Russell, and

Jon B. Whitney. A true and correct copy of the '707 patent is attached as Exhibit 3.

54.     The '707 patent is presumed valid under 35 U.S.C. § 282.

55.     Slingshot owns all substantial rights, title and interest in the '707 patent.

56.     As set forth in the Abstract, the '707 patent is directed to, among other

things,

> An ink jet printhead assembly for a pressure controlled ink jet printhead. The
> assembly includes an ink reservoir made of a first material having a first melting
> point and having an open top cavity defined by sidewalls, a bottom wall and a
> peripheral edge. A pressure control structure made of a polymeric material
> having a second melting point lower than the first melting point is included. The
> pressure control structure has a first surface, a second surface opposite the first
> surface, a side surface, and an aperture therein. A sealing structure for forming a
> liquid tight seal is provided between the sidewalls of the ink reservoir and the
> side surface of the pressure control structure. A pressure regulating film is

17

attached over the aperture to the first surface of the pressure control structure. A cover is attached to the ink reservoir.

### United States Patent No. 7,258,434

57.     On August 21, 2007, the USPTO duly and legally issued United States Patent No. 7,258,434 ("the '434 patent") entitled "Inkjet printheads having multiple label placement positions for air diffusion" to inventors Brian D. Smith, David E. Greer, and Sara M. Coneway. A true and correct copy of the '434 patent is attached as Exhibit 4.

58.     The '434 patent is presumed valid under 35 U.S.C. § 282.

59.     Slingshot owns all substantial rights, title and interest in the '434 patent.

60.     As set forth in the Abstract, the '434 patent is directed to, among other things,

> The invention teaches placing labels over air diffusion vents on inkjet printheads depending upon a content of the inkjet printhead. In one embodiment, the inkjet printhead contains one or three inks in its interior and has three air diffusion vents in a lid that fluidly communicate with the interior. If the interior has one ink, a label covers the entirety of two of the three air diffusion vents to substantially prevent the two air diffusion vents from communicating with atmosphere. If the interior has three inks, a label only covers a portion of each of the three air diffusion vents and allows each to fluidly communicate with atmosphere. In this manner, single or tri-color inkjet printhead manufacturing can occur with a single lid having a multiplicity of label placement positions. The labels can have similar dimensions, dissimilar length dimensions or other.

### United States Patent No. 7,938,523

61.     On May 10, 2011, the USPTO duly and legally issued United States Patent No. 7,938,523 ("the '523 patent") entitled "Fluid supply tank ventilation for a micro-fluid ejection head" to inventor Charles S. Aldrich. A true and correct copy of the '523 patent is attached as Exhibit 5.

23152307

62. The '523 patent is presumed valid under 35 U.S.C. § 282.

63. Slingshot owns all substantial rights, title and interest in the '523 patent.

64. As set forth in the Abstract, the '523 patent is directed to, among other things,

> An improved fluid supply tank for a micro-fluid ejection head and method for improving operation of a micro-fluid ejection device. The fluid supply tank has a body portion for holding a fluid to be ejected. The body portion includes a fluid exit port on an exit end thereof and a cover on an opposing end thereof. An internal vent conduit is disposed in the tank between the exit end and the cover for air removal adjacent to the exit port.

## HP's INFRINGEMENT OF THE PATENTS-IN-SUIT

65. Defendant has made, used, sold, offered for sale, and continues to make, use, sell and offer to sell in the United States thermal inkjet printers and thermal inkjet cartridges that infringe the asserted patents.

66. HP's inkjet cartridges including at least, HP 60, HP 60XL, HP 61, HP 61XL, HP 62, HP 62XL, HP 63, HP 63 XL, HP 64, HP 64 XL, HP 65, HP 65XL, HP 97, HP 564, HP 564XL, HP 902, HP 902XL, HP 920XL, HP 931, HP 951, HP 971 HP 932, HP 933, HP 950, HP 950XL, HP 970, HP 970 XL, HP 971 XL, HP 972, and HP 980 (collectively, "Accused Inkjet Cartridges") infringe at least one claim of one or more of the asserted patents.

67. HP's inkjet printers including at least, Deskjet 1000, Deskjet 1010, Deskjet 1050, Deskjet 1051, Deskjet 1055, Deskjet 1056, Deskjet 1510, Deskjet 1512, Deskjet 2050, Deskjet 2510, Deskjet 2512, Deskjet 2514, Deskjet 2540, Deskjet 2541, Deskjet 2542, Deskjet 2543, Deskjet 2544, Deskjet 3000, Deskjet 3050, Deskjet 3050A, Deskjet 3051A,

23152307

Deskjet 3052A, Deskjet 3054, Deskjet 3056A, Deskjet 3510, Deskjet 3511, Deskjet 3512, Deskjet 3516, HP Photosmart C6250, HP Photosmart 6500, HP OfficeJet 2620, HP OfficeJet 4630, HP OfficeJet 4632, HP OfficeJet 6600/6700, HP Office Jet Pro 6978, HP OfficeJet Pro 7720, HP OfficeJet Pro 7730, HP OfficeJet Pro 7740, HP OfficeJet Pro 8600, HP OfficeJet Pro 6978, HP OfficeJet Pro 8710, HP OfficeJet Pro 8720, HP OfficeJet Pro 8730, HP OfficeJet Pro 8740, HP OfficeJet Pro X, ENVY 4500 e-All-in-One, ENVY 4501, ENVY 4502, ENVY 4503 e-All-in-One, ENVY 4504 e-All-in-One, ENVY 4505, ENVY 5530 e-All-in-One, ENVY 5531 e-All-in-One, ENVY 5535 e-All-in-One,  HP T120 and HP T520 (collectively, "Accused Inkjet Printers"), infringe at least one claim of one or more of the asserted patents.

68.    Heater chips used in HP's inkjet cartridges including at least, HP WBR and MZT Heater Chips (collectively, "Accused Heater Chips"), infringe at least one claim of one or more of the asserted patents.

69.    The Accused Inkjet Cartridges, Accused Inkjet Printers and Accused Heater Chips are collectively "Accused Products".

70.    Defendant's acts of infringement have damaged Plaintiff. Plaintiff is entitled to recover from Defendant the damages Plaintiff incurred and is continuing to incur as a result of Defendant's wrongful acts.

## ACTS GIVING RISE TO THIS ACTION

### Count I – Infringement of United States Patent Number 6,243,115

71.    Slingshot repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs, as set forth above.

23152307

72.     Defendant has infringed and continues to infringe in violation of 35 U.S.C. § 271(a) one or more claims of the '115 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '115 patent including. The accused products that infringe one or more claims of the '115 patent include, but are not limited to, the HP 901, HP 902, HP 951, and HP 952 ink cartridges.

73.     Upon information and belief, each of the above-listed ink cartridges have the same air-pressurized ink supply, which means the above-listed ink cartridges infringe each and every element of at least claim 1 of the '115 patent literally or under the doctrine of equivalents. Further discovery may reveal additional infringing products and/or models.

74.     For example, claim 1 of the '115 patent covers:

1.     An ink supply and delivery system for a printer cartridge, comprising:

a printer cartridge having an interior, at least one air inlet to the interior, and at least one ink outlet from the interior;

an air pump connected to the air inlet for creating a positive pressure in the interior of the printer cartridge;

an ink source including ink in the interior of the printer cartridge and in fluid communication with the ink outlet; and

a resilient air container in the interior of the printer cartridge and in fluid communication with the air inlet, the air container expanding from the positive pressure created by the air pump for forcing the ink from the ink source through the ink outlet.

75.     For example, the HP 952 or HP 952 XL ink cartridges, which are seen in the images below, meet each and every limitation of claim 1 of the '115 patent enumerated above.



76.    The images show the HP 952 or HP 952 XL ink cartridges are printer

cartridges having an interior.

77.    Upon inspection, and upon information and belief, the HP 952 or HP 952

XL cartridges have (1) "least one air inlet to the interior, and at least one ink outlet from

the interior;" (2) "an air pump connected to the air inlet for creating a positive pressure

in the interior of the printer cartridge;" (3) "an ink source including ink in the interior of

the printer cartridge and in fluid communication with the ink outlet;" and (4) "a

resilient air container in the interior of the printer cartridge and in fluid communication

with the air inlet, the air container expanding from the positive pressure created by the

air pump for forcing the ink from the ink source through the ink outlet." Accordingly,

the HP 952 or HP 952 XL ink cartridges infringe each and every element of claim 1 of

the '115 patent literally or under the doctrine of equivalents.

78.    Defendant's infringement of the '115 patent has damaged Plaintiff, and

Plaintiff is entitled to recover from HP the damages it has sustained as a result of

Defendant's wrongful acts including, but not limited to a reasonable royalty.

23152307

## Count II – Infringement of United States Patent Number 6,394,593

79.     Slingshot repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs, as set forth above.

80.     Defendant has infringed and continues to infringe in violation of 35 U.S.C. § 271(a) one or more claims of the '593 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '593 patent. The accused products that infringe one or more claims of the '593 patent include, but are not limited to, the HP 901, HP 902, HP 951, and HP 952 ink cartridges.

81.     Upon information and belief, each of the above-listed ink cartridges have the same air-pressurized ink supply, which means the above-listed ink cartridges infringe each and every element of at least claim 1 of the '593 patent literally or under the doctrine of equivalents. Further discovery may reveal additional infringing products and/or models.

82.     For example, claim 1 of the '593 patent covers:

1. An ink cartridge for an ink jet printer, the cartridge comprising a body portion including a first panel portion having an interior surface opposite an exterior surface exposed to an atmosphere having an atmospheric pressure, a second panel portion attachable to the body portion to define a cavity for containing ink between the first panel portion and the second panel portion, and a chamber defined within the cavity adjacent the interior surface of the first panel portion of the body portion,

a lung type pressure regulator disposed within the cavity adjacent the chamber, and an air diffusion path for providing flow communication between the chamber and the atmosphere, the air diffusion path comprising an elongate flow path defined on the first panel portion of the body portion, the flow path having a first end in flow communication with the chamber and a second end located on the exterior surface of the first panel portion of the body and in flow communication with the atmosphere,

whereby the flow path enables air flow communication between the chamber and the atmosphere while substantially inhibiting flow of water vapor out of the chamber.

83. For example, the HP 952 or HP 952 XL ink cartridges, which are seen in the images below, meet each and every limitation of claim 1 of the '593 patent enumerated above.



84. The images show the HP 952 or HP 952 XL ink cartridges ink cartridges for an ink jet printer.

85. Upon inspection, and upon information and belief, the cartridges have: (1) a "body portion including a first panel portion having an interior surface opposite an exterior surface exposed to an atmosphere having an atmospheric pressure, a second panel portion attachable to the body portion to define a cavity for containing ink between the first panel portion and the second panel portion, and a chamber defined within the cavity adjacent the interior surface of the first panel portion of the body portion;" and (2) "a lung type pressure regulator disposed within the cavity adjacent the chamber, and an air diffusion path for providing flow communication between the

chamber and the atmosphere, the air diffusion path comprising an elongate flow path defined on the first panel portion of the body portion, the flow path having a first end in flow communication with the chamber and a second end located on the exterior surface of the first panel portion of the body and in flow communication with the atmosphere." Additionally, the "the flow path enables air flow communication between the chamber and the atmosphere while substantially inhibiting flow of water vapor out of the chamber." Accordingly, the HP 952 or HP 952 XL ink cartridges infringe each and every element of claim 1 of the '593 patent literally or under the doctrine of equivalents.

86.     Defendant's infringement of the '593 patent has damaged Plaintiff, and Plaintiff is entitled to recover from HP the damages it has sustained as a result of Defendant's wrongful acts including, but not limited to a reasonable royalty.

### Count III – Infringement of United States Patent Number 6,817,707

87.     Slingshot repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs, as set forth above.

88.     Defendant has infringed and continues to infringe in violation of 35 U.S.C. § 271(a) one or more claims of the '707 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '707 patent. The accused products that infringe one or more claims of the '707 patent include, but are not limited to HP 901, HP 902, HP 951, HP 952, HP 970, HP 971, and HP 972 ink cartridges. Further discovery may reveal additional infringing products and/or models.

89.     Upon information and belief, each of the above-listed ink cartridges have the same pressure-control structure, which means the above-listed ink cartridges

23152307

infringe each and every element of at least claim 1 of the '707 patent literally or under the doctrine of equivalents. Further discovery may reveal additional infringing products and/or models.

90.     For example, claim 1 of the '707 patent covers:

1. An ink jet printhead assembly for a pressure controlled ink jet printhead comprising:

an ink reservoir having an open top cavity defined by sidewalls, a bottom wall and a peripheral edge, the ink reservoir being made of a first material having a first melting point;

a pressure control structure having a first surface, a second surface opposite the first surface, a side surface, and an aperture extending therethrough from the first surface to the second surface, the pressure control structure being made of a polymeric material having a second melting point lower than the first melting point;

a sealing structure for forming a liquid tight seal between the sidewalls of the ink reservoir and the side surface of the pressure control structure;

a pressure regulating film attached to the first surface of the pressure control structure closing the aperture therein; and

a cover attached to the ink reservoir to protect the pressure regulating film from damage.

91.     For example, the HP 952 or HP 952 XL ink cartridges, which are seen in the images below, meet each and every limitation of claim 1 of the '593 patent enumerated above.



92.  The images show the HP 952 or HP 952 XL ink cartridges are part of "[a]n ink jet printhead assembly for a pressure controlled ink jet printhead."

93.  Upon inspection, and upon information and belief, the HP 952 or HP 952 XL ink cartridges have: (1) "an ink reservoir having an open top cavity defined by sidewalls, a bottom wall and a peripheral edge, the ink reservoir being made of a first material having a first melting point;" (2) "a pressure control structure having a first surface, a second surface opposite the first surface, a side surface, and an aperture extending therethrough from the first surface to the second surface, the pressure control structure being made of a polymeric material having a second melting point lower than the first melting point;" (3) "a sealing structure for forming a liquid tight seal between the sidewalls of the ink reservoir and the side surface of the pressure control structure;" (4) "a pressure regulating film attached to the first surface of the pressure control structure closing the aperture therein;" and (5) "a cover attached to the ink reservoir to protect the pressure regulating film from damage." Accordingly, the HP 952 or HP 952 XL ink cartridges infringe each and every element of claim 1 of the '707 patent literally or under the doctrine of equivalents.

94.     Defendant's infringement of the '707 patent has damaged Plaintiff, and Plaintiff is entitled to recover from HP the damages it has sustained as a result of Defendant's wrongful acts including, but not limited to a reasonable royalty.

### Count IV – Infringement of United States Patent Number 7,258,434

95.     Slingshot repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs, as set forth above.

96.     Defendant has infringed and continues to infringe in violation of 35 U.S.C. § 271(a) one or more claims of the '434 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '434 patent. The accused products that infringe one or more claims of the '434 patent include, but are not limited to, HP 60, HP 60 XL, HP 61, HP 61 XL, HP 62, HP 62 XL, HP 63, HP 63 XL, HP 64 XL, HP 64, HP 65, and HP 65 XL ink cartridges.

97.     Upon information and belief, each of the above-listed ink cartridges have the same fluid-supply tank, which means the above-listed ink cartridges infringe each and every element of at least claim 1 of the '434 patent literally or under the doctrine of equivalents. Further discovery may reveal additional infringing products and/or models.

98.     For example, claim 1 of the '434 patent covers:

1. An inkjet printhead, comprising:

a plurality of air diffusion vents; and

a label positioned over an entirety of at least one of said air diffusion vents during printing, said label being positioned over a portion but not an entirety of another of said air diffusion vents during printing.

28

23152307

99.     For example, the HP 64 and HP 64 XL ink cartridges, which are seen in the images below, meet each and every limitation of claim 1 of the '434 patent enumerated above.




100.     Upon inspection, and upon information and belief, the images show that the HP 64 and HP 64 XL ink cartridges are an "inkjet printhead" that has "a plurality of air diffusion vents" and "a label positioned over an entirety of at least one of said air diffusion vents during printing, said label being positioned over a portion but not an entirety of another of said air diffusion vents during printing." Accordingly, the HP 64 XL ink cartridges infringe each and every element of claim 1 of the '434 patent literally or under the doctrine of equivalents.

101.     Defendant's infringement of the '434 patent has damaged Plaintiff, and Plaintiff is entitled to recover from HP the damages it has sustained as a result of Defendant's wrongful acts including, but not limited to a reasonable royalty.

23152307

## <u>Count V– Infringement of United States Patent Number 7,938,523</u>

102.     Slingshot repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs, as set forth above.

103.     Defendant has infringed and continues to infringe in violation of 35 U.S.C. § 271(a) one or more claims of the '523 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '523 patent. The accused products that infringe one or more claims of the '523 patent include, but are not limited to HP 564, HP 920, and HP 920XL ink cartridges. Further discovery may reveal additional infringing products and/or models.

104.     Upon information and belief, each of the above-listed ink cartridges have the same internal vent conduit in the ink tank, which means the above-listed ink cartridges infringe each and every element of at least claim 1 of the '434 patent literally or under the doctrine of equivalents. Further discovery may reveal additional infringing products and/or models.

105.     For example, claim 1 of the '523 patent covers:

1. A fluid supply tank for a micro-fluid ejection head, the fluid supply tank comprising:

a body portion for holding a fluid to be ejected, the body portion having a fluid exit port on an exit end thereof and a cover on an opposing end thereof of the body portion, the cover having an opening in fluid communication with atmosphere;

an internal vent conduit disposed between the exit end and the cover for removing air adjacent to the fluid exit port and releasing the air through the cover to said atmosphere; and

an air space in the fluid exit port wherein the internal vent conduit is in air flow communication with the air space and the cover.

106.     Upon inspection, and upon information and belief, the HP 952 or HP 952

XL ink cartridges, which are seen in the images below, meet each and every limitation

of claim 1 of the '523 patent enumerated above.



107.     The images show the HP 952 or HP 952 XL ink cartridges include "a fluid

supply tank for a micro-fluid ejection head" that comprises (1) "a body portion for

holding a fluid to be ejected, the body portion having a fluid exit port on an exit end

thereof and a cover on an opposing end thereof of the body portion, the cover having an

opening in fluid communication with atmosphere;" (2) "an internal vent conduit

disposed between the exit end and the cover for removing air adjacent to the fluid exit

port and releasing the air through the cover to said atmosphere;" and (3) "an air space

in the fluid exit port wherein the internal vent conduit is in air flow communication

with the air space and the cover." Accordingly, the HP 64 XL ink cartridges infringe

each and every element of claim 1 of the '523 patent literally or under the doctrine of

equivalents.

23152307

108.    Defendant's infringement of the '523 patent has damaged Plaintiff, and Plaintiff is entitled to recover from HP the damages it has sustained as a result of Defendant's wrongful acts including, but not limited to a reasonable royalty.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter the following legal and equitable relief in favor of Plaintiff and against Defendant as a result of Defendant's infringing conduct:

a.    A judgment that Defendant has directly infringed, either literally or under the doctrine of equivalents, one or more claims of the asserted patents;

b.    A judgment that awards Plaintiff all appropriate damages under 35 U.S.C. § 284 for Defendant's past infringement, and any continuing or future infringement of the asserted patents, including pre- or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284.

c.    Declare this case exceptional and award Slingshot its reasonable attorneys' fees as the prevailing party as provided by 35 U.S.C. § 285.

d.    Such other and further relief as the Court deems just and proper.

## <u>Jury Demand</u>

Plaintiff, pursuant to Federal Rule of Civil Procedure 38(b), demands a trial by jury.

23152307

Dated: June 11, 2019                    Respectfully submitted,


                                        */s/Raymond W. Mort, III*
                                        Raymond W. Mort, III
                                        Texas State Bar No. 00791308
                                        raymort@austinlaw.com

                                        THE MORT LAW FIRM, PLLC
                                        100 Congress Avenue, Suite 2000
                                        Austin, Texas 78701
                                        Tel/Fax: 512-865-7950

                                        *Of Counsel:*
                                        Ronald M. Daignault (*pro hac vice* to be filed)
                                        Chandran B. Iyer (*pro hac vice* to be filed)
                                        Michael A. Siem (*pro hac vice* to be filed
                                        rdaignault@goldbergsegalla.com
                                        ciyer@goldbergsegalla.com
                                        msiem@ goldbergsegalla.com
                                        GOLDBERG SEGALLA LLP
                                        711 Third Avenue, Suite 1900
                                        New York, New York 10017
                                        Telephone: (646) 292-8700

                                        Richard Juang (*pro hac vice* to be filed)
                                        rjuang@goldbergsegalla.com
                                        GOLDBERG SEGALLA LLP
                                        8000 Maryland Avenue, Suite 640
                                        St. Louis, Missouri 63105
                                        Telephone: (314) 446-3367

                                        Attorneys for Plaintiff

23152307